UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA      :

     - v. -      :      SEALED INDICTMENT

                        :
LIBERTY RESERVE S.A.,      :      13 CRIM 368
ARTHUR BUDOVSKY,      :
   a/k/a "Arthur Belanchuk,"      :
   a/k/a "Eric Paltz,"      :
VLADIMIR KATS,      :
   a/k/a "Ragnar,"      :
AHMED YASSINE ABDELGHANI,      :
   a/k/a "Alex,"      :
ALLAN ESTEBAN HIDALGO JIMENEZ,      :
   a/k/a "Allan Garcia,"      :
AZZEDDINE EL AMINE,      :
MARK MARMILEV,      :
   a/k/a "Marko,"      :
   a/k/a "Mark Halls," and      :
MAXIM CHUKHAREV,      :

      Defendants.      :

- - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: MAY 2 0 2013

## COUNT ONE

**(Conspiracy to Commit Money Laundering)**

    The Grand Jury charges:

### THE DEFENDANTS

    1.   Incorporated in Costa Rica in 2006, LIBERTY RESERVE

S.A. ("LIBERTY RESERVE"), the defendant, has for years operated

one of the world's most widely used digital currencies. Through

its website, www.libertyreserve.com, LIBERTY RESERVE has

provided its users with what it described as "instant, real-time

currency for international commerce," which can be used to "send

and receive payments from anyone, anywhere on the globe." LIBERTY RESERVE also touted itself as the Internet's "largest payment processor and money transfer system," serving "millions" of people around the world, including the United States. At no time, however, did LIBERTY RESERVE register with the United States Department of the Treasury as a money transmitting business.

2.  ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk," a/k/a "Eric Paltz," the defendant, was the principal founder of LIBERTY RESERVE. At all relevant times, BUDOVSKY directed and supervised LIBERTY RESERVE's operations, finances, and corporate strategy.

3.  VLADIMIR KATS, a/k/a "Ragnar," the defendant, was a co-founder of LIBERTY RESERVE. KATS helped direct LIBERTY RESERVE until he left the company over a dispute with ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk," a/k/a "Eric Paltz," the defendant, in or about 2009. KATS has also run multiple LIBERTY RESERVE "exchanger" services.

4.  AHMED YASSINE ABDELGHANI, a/k/a "Alex," the defendant, managed the day-to-day operations of LIBERTY RESERVE from in or about 2006 through in or about 2009, when he too left the company over a dispute with ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk," a/k/a "Eric Paltz," the defendant.

5.   ALLAN ESTEBAN HIDALGO JIMENEZ, a/k/a "Allan Garcia,"
the defendant, replaced AHMED YASSINE ABDELGHANI, a/k/a "Alex,"
the defendant, as the manager of LIBERTY RESERVE's day-to-day
operations.  HIDALGO has also been a part-owner of LIBERTY
RESERVE since in or about 2010.

6.   AZZEDDINE EL AMINE, the defendant, has, since in or
about 2010, served as a principal deputy to ARTHUR BUDOVSKY,
a/k/a "Arthur Belanchuk," a/k/a "Eric Paltz," the defendant.  He
has managed various financial accounts controlled by LIBERTY
RESERVE and operated a prominent LIBERTY RESERVE "exchanger"
service, from which he has shared the profits with BUDOVSKY.

7.   MARK MARMILEV, a/k/a "Marko," a/k/a "Mark Halls," the
defendant, and MAXIM CHUKHAREV, the defendant, were associates
of ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk," a/k/a "Eric
Paltz," and were principally responsible for designing and
maintaining LIBERTY RESERVE's technological infrastructure.

### OVERVIEW

8.   ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk," a/k/a "Eric
Paltz," the defendant, and his co-conspirators, intentionally
created, structured, and operated LIBERTY RESERVE as a criminal
business venture, one designed to help criminals conduct illegal
transactions and launder the proceeds of their crimes.  The
defendants deliberately attracted and maintained a customer base
of criminals by making financial activity on LIBERTY RESERVE

anonymous and untraceable. The defendants also protected the
criminal infrastructure they created by, among other things,
lying to anti-money laundering authorities in Costa Rica,
pretending to shut down LIBERTY RESERVE after learning the
company was being investigated by U.S. law enforcement (only to
continue operating the business through a set of shell
companies), and moving tens of millions of dollars through
shell-company accounts maintained in Cyprus, Russia, Hong Kong,
China, Morocco, Spain, and Australia, among other places.

9.    Through the defendants' efforts, LIBERTY RESERVE has
emerged as one of the principal means by which cyber-criminals
around the world distribute, store, and launder the proceeds of
their illegal activity.  Indeed, LIBERTY RESERVE has become a
financial hub of the cyber-crime world, facilitating a broad
range of online criminal activity, including credit card fraud,
identity theft, investment fraud, computer hacking, child
pornography, and narcotics trafficking.

10.   Because virtually all of LIBERTY RESERVE's business
derived from suspected criminal activity, the scope of the
defendants' unlawful conduct is staggering.  Estimated to have
had more than one million users worldwide, with more than
200,000 users in the United States, LIBERTY RESERVE processed
more than 12 million financial transactions annually, with a
combined value of more than $1.4 billion.  Overall, from 2006 to

May 2013, LIBERTY RESERVE processed an estimated 55 million separate financial transactions and is believed to have laundered more than $6 billion in criminal proceeds.

## THE FOUNDING OF LIBERTY RESERVE

11.    LIBERTY RESERVE, as currently constituted, was born out of the defendants' unsuccessful experience running a third-party exchange service for another digital currency. Specifically, in or about 2006, ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk," a/k/a "Eric Paltz," and VLADIMIR KATS, a/k/a "Ragnar," the defendants, operated a company called "Gold Age, Inc.," which functioned as an "exchanger" for "E-Gold," then the most popular digital currency in operation. However, in December 2006, BUDOSVKY and KATS were convicted in New York State of operating "Gold Age, Inc." as an unlicensed money transmitting business. At or about the same time, E-Gold and several of its principals were charged with various offenses including money laundering.

12.    In the wake of his criminal conviction, ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk," a/k/a "Eric Paltz," the defendant, set about building a digital currency that would succeed in eluding law enforcement where E-Gold had failed, by, among other ways, locating the business outside the United States. Accordingly, BUDOVSKY emigrated to Costa Rica, where, in 2006, he and AHMED YASSINE ABDELGHANI, a/k/a "Alex," the

defendant, had incorporated LIBERTY RESERVE.  Working at first principally with YASSINE and VLADIMIR KATS, a/k/a "Ragnar," the defendant, BUDOVSKY devoted himself to building and expanding LIBERTY RESERVE so that the company could profit from attracting more and more criminal customers, all while seeking to evade the scrutiny and reach of U.S. law enforcement authorities.

13.  LIBERTY RESERVE thereupon grew exponentially, filling the void left by E-Gold and becoming the predominant digital form of money laundering used by cyber-criminals worldwide.  By in or about 2011, BUDOVSKY was so committed to evading U.S. law enforcement that he formally renounced his U.S. citizenship and became a Costa Rican citizen, telling U.S. immigration authorities that he was concerned that the "software" his "company" was developing "might open him up to liability in the U.S."

THE CRIMINAL DESIGN OF LIBERTY RESERVE

14.  To use LIBERTY RESERVE's digital currency, commonly referred to as "LR," a user first was required to open an account through the LIBERTY RESERVE website.  In registering, the user was required to provide basic identifying information, such as name, address, and date of birth.  However, unlike traditional banks or legitimate online payment processors, LIBERTY RESERVE did not require users to validate their identity information, such as by providing official identification

documents or a credit card.  Accounts could therefore be opened

easily using fictitious or anonymous identities.

15.   Once a user established an account with LIBERTY

RESERVE, the user could then conduct transactions with other

LIBERTY RESERVE users.  That is, the user could receive

transfers of LR from other users' accounts, and transfer LR from

his own account to other users – including any "merchants" that

accepted LR as payment.  LIBERTY RESERVE charged a one-percent

fee every time a user transferred LR to another user through the

LIBERTY RESERVE system.  In addition, for an additional "privacy

fee" of 75 cents per transaction, a user could hide his own

LIBERTY RESERVE account number when transferring funds,

effectively making the transfer completely untraceable, even

within LIBERTY RESERVE's already opaque system.

16.   To add an additional layer of anonymity, LIBERTY

RESERVE did not permit users to fund their accounts by

transferring money to LIBERTY RESERVE directly, such as by

issuing a credit card payment or wire transfer to LIBERTY

RESERVE.  Nor could LIBERTY RESERVE users withdraw funds from

their accounts directly, such as through an ATM withdrawal.

Instead, LIBERTY RESERVE users were required to make any

deposits or withdrawals through the use of third-party

"exchangers," thus enabling LIBERTY RESERVE to avoid collecting

any information about its users through banking transactions or

other activity that would leave a centralized financial paper trail.

17. LIBERTY RESERVE's "exchangers" were third-party entities that maintained direct financial relationships with LIBERTY RESERVE, buying and selling LR in bulk from LIBERTY RESERVE in exchange for mainstream currency. The exchangers in turn bought and sold this LR in smaller transactions with end users in exchange for mainstream currency. Thus, in order to fund a LIBERTY RESERVE account, a user was required to transmit mainstream currency in some fashion (through a money remitter, for example) to an exchanger. Upon receiving the user's payment, the exchanger credited the user's LIBERTY RESERVE account with a corresponding amount of LR, by transferring LR from the exchanger's LIBERTY RESERVE account to the user's account. Similarly, if a LIBERTY RESERVE user wished to withdraw funds from his account, the user was required to transfer LR from his LIBERTY RESERVE account to an exchanger's LIBERTY RESERVE account, and the exchanger then made arrangements to provide the user a corresponding amount of mainstream currency.

18. The LIBERTY RESERVE website recommended a number of "pre-approved" exchangers. These exchangers tended to be unlicensed money transmitting businesses operating without significant governmental oversight or regulation, concentrated

in Malaysia, Russia, Nigeria, and Vietnam.  The exchangers

charged transaction fees for their services, typically amounting

to five percent or more of the funds being exchanged.  Such fees

were much higher than those charged by mainstream banks or

payment processors for comparable money transfers.

### THE CRIMINAL USE OF LIBERTY RESERVE

19.  As set forth above, LIBERTY RESERVE's system was

designed so that criminals could effect financial transactions

under multiple layers of anonymity and thereby avoid

apprehension by law enforcement.  Not surprisingly, LIBERTY

RESERVE was in fact used extensively for illegal purposes,

functioning in effect as the bank of choice for the criminal

underworld.  LIBERTY RESERVE users routinely established

accounts under false names – including such blatantly criminal

monikers as "Russia Hackers" and "Hacker Account."  Believing

themselves to be protected by this anonymity, LIBERTY RESERVE

users then engaged in criminal transactions with an impunity

that would have been impossible in the legitimate financial

system.

20.  To further enable the use of LIBERTY RESERVE for

criminal activity, its website offered a "shopping cart

interface" that "merchant" websites could use to accept LR

currency as a form of payment.  The "merchants" who accepted LR

currency were overwhelmingly criminal in nature.  They included,

for example: traffickers of stolen credit card data and personal
identity information; peddlers of various types of online Ponzi
and get-rich-quick schemes; computer hackers for hire;
unregulated gambling enterprises; and underground drug-dealing
websites.

21.    In addition to being used to process payments for
illegal goods and services online, LIBERTY RESERVE was also used
by cyber-criminals to launder criminal proceeds and transfer
funds among criminal associates.  LIBERTY RESERVE was used by
credit-card theft and computer-hacking rings operating in
countries around the world, including Vietnam, Nigeria, Hong
Kong, China, and the United States, to distribute proceeds of
these conspiracies among the members involved.

22.    The defendants were well aware that LIBERTY RESERVE
functioned as an unlawful money-laundering enterprise.  Indeed,
in an online chat that was captured by law enforcement between
VLADIMIR KATS, a/k/a "Ragnar," and AHMED YASSINE ABDELGHANI,
a/k/a "Alex," KATS explicitly described LIBERTY RESERVE's
activities as "illegal" and noted that "everyone in USA" such as
"DOJ" knows "LR is [a] money laundering operation that hackers
use."

        EFFORTS TO CONCEAL LIBERTY RESERVE'S OPERATIONS AND ASSETS

23.    Throughout its operation, LIBERTY RESERVE and its
principals sought to thwart effective regulation by anti-money

laundering authorities and to evade the reach of law
enforcement.

24. For example, in or about 2009, a Costa Rican agency
responsible for regulating financial institutions, known as
Superintendencia General de Entidades Financieras ("SUGEF"),
determined that LIBERTY RESERVE fell within its jurisdiction and
notified the company that it needed to apply for a license to
operate as a money transmitting business in Costa Rica.
Beginning in or about October 2009, LIBERTY RESERVE sought such
a license from SUGEF, but SUGEF refused to grant the application
based on concerns that LIBERTY RESERVE did not have even basic
anti-money laundering controls in place such as "know your
customer" procedures, and otherwise lacked any effective means
of tracking suspicious activity within its system.

25. Instead of remedying these deficiencies, LIBERTY
RESERVE created a system designed to feign compliance with anti-
money laundering procedures. Specifically, ARTHUR BUDOVSKY,
a/k/a "Arthur Belanchuk," a/k/a "Eric Paltz," ALLAN ESTEBAN
HIDALGO JIMENEZ, a/k/a "Allan Garcia," MARK MARMILEV, a/k/a
"Marko," a/k/a "Mark Halls," and MAXIM CHUKHAREV, the
defendants, created a computer portal that appeared to give
Costa Rican regulators the ability to access LIBERTY RESERVE
transactional information and monitor it for suspicious
activity. However, the data that appeared in the portal was,

according to internal communications between the defendants,
mostly "fake" and could be manipulated to hide data that LIBERTY
RESERVE did not want regulators to see.

26.  By November 2011, LIBERTY RESERVE had still been
unable to obtain a license from SUGEF to operate legally in
Costa Rica.  Compounding the company's troubles, on or about
November 18, 2011, the U.S. Department of the Treasury's
Financial Crimes Enforcement Network ("FinCEN") issued a notice
to financial institutions within its network of the risks
associated with providing financial services to LIBERTY RESERVE.
The notice stated, among other things, that: "[i]nformation
obtained by the United States Department of the Treasury
indicates LIBERTY RESERVE is . . . currently being used by
criminals to conduct anonymous transactions to move money
globally."

27.  LIBERTY RESERVE obtained a copy of the FinCEN notice.
Approximately two weeks after the FinCEN notice was issued,
LIBERTY RESERVE falsely informed SUGEF that its business had
been sold to a foreign company and would no longer be operating
in Costa Rica.  LIBERTY RESERVE thus withdrew its application
for a money-transmitting license from SUGEF and purported to
shut down its office in Costa Rica.  In reality, however,
LIBERTY RESERVE went underground and continued to operate in
Costa Rica using a stripped-down staff working out of office

space held in the name of shell companies controlled by ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk," a/k/a "Eric Paltz," the defendant.

28.     At or about the same time LIBERTY RESERVE falsely informed SUGEF that it was shutting down its operations in Costa Rica, ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk," a/k/a "Eric Paltz," ALLAN ESTEBAN HIDALGO JIMENEZ, a/k/a "Allan Garcia," and AZZEDDINE EL AMINE, the defendants, began emptying LIBERTY RESERVE's bank accounts in Costa Rica of millions of dollars and transferring the money first to a bank account in Cyprus held in the name of a shell company controlled by BUDOVSKY and EL AMINE, and then to a bank account in Russia held in the name of another shell company.

29.     Shortly after the defendants began emptying LIBERTY RESERVE's bank accounts in Costa Rica, the Costa Rican government was able to seize approximately $19.5 million in Costa Rican bank accounts maintained by LIBERTY RESERVE pursuant to a request by U.S. law enforcement authorities.  Following that seizure, BUDOVSKY, HIDALGO, and EL AMINE sought to evade further seizure action by moving LIBERTY RESERVE funds into more than two dozen shell-company accounts held in locations around the world, including Cyprus, Hong Kong, China, Morocco, Australia, and Spain.

30. From in or about 2006, up to and including in or about May 2013, in the Southern District of New York and elsewhere, LIBERTY RESERVE, ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk," a/k/a "Eric Paltz," VLADIMIR KATS, a/k/a "Ragnar," AHMED YASSINE ABDELGHANI, a/k/a "Alex," ALLAN ESTEBAN HIDALGO JIMENEZ, a/k/a "Allan Garcia," AZZEDDINE EL AMINE, MARK MARMILEV, a/k/a "Marko," a/k/a "Mark Halls," and MAXIM CHUKHAREV, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit money laundering, in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 1956(a)(2)(B)(i).

31. It was a part and an object of the conspiracy that LIBERTY RESERVE, ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk," a/k/a "Eric Paltz," VLADIMIR KATS, a/k/a "Ragnar," AHMED YASSINE ABDELGHANI, a/k/a "Alex," ALLAN ESTEBAN HIDALGO JIMENEZ, a/k/a "Allan Garcia," AZZEDDINE EL AMINE, MARK MARMILEV, a/k/a "Marko," a/k/a "Mark Halls," and MAXIM CHUKHAREV, the defendants, and others known and unknown, in an offense involving and affecting interstate and foreign commerce, knowing that the property involved in certain financial transactions represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such financial

transactions, which in fact involved the proceeds of specified
unlawful activity, to wit, identity theft, access device fraud,
computer hacking, wire fraud, child pornography, and narcotics
trafficking, in violation of Title 18, United States Code,
Sections 1028, 1029, 1030, 1343, and 2252, and Title 21, United
States Code, Section 841, respectively, knowing that the
transactions were designed in whole and in part to conceal and
disguise the nature, the location, the source, the ownership,
and the control of the proceeds of specified unlawful activity,
in violation of Title 18, United States Code, Section
1956(a)(1)(B)(i).

32. It was further a part and an object of the conspiracy
that LIBERTY RESERVE, ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk,"
a/k/a "Eric Paltz," VLADIMIR KATS, a/k/a "Ragnar," AHMED YASSINE
ABDELGHANI, a/k/a "Alex," ALLAN ESTEBAN HIDALGO JIMENEZ, a/k/a
"Allan Garcia," AZZEDDINE EL AMINE, MARK MARMILEV, a/k/a
"Marko," a/k/a "Mark Halls," and MAXIM CHUKHAREV, the
defendants, and others known and unknown, would and did
transport, transmit, and transfer, and attempt to transport,
transmit, and transfer, monetary instruments and funds from
places in the United States to and through places outside the
United States, and to places in the United States from and
through places outside the United States, knowing that the
monetary instruments and funds involved in the transportation,

transmissions, and transfers represented the proceeds of some form of unlawful activity, and knowing that such transportation, transmissions, and transfers were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, to wit, identity theft, access device fraud, computer hacking, wire fraud, child pornography, and narcotics trafficking, in violation of Title 18, United States Code, Sections 1028, 1029, 1030, 1343, and 2252, and Title 21, United States Code, Section 841, respectively, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i).

(Title 18, United States Code, Section 1956(h).)

## COUNT TWO

**(Conspiracy to Operate Unlicensed Money Transmitting Business)**

The Grand Jury further charges:

### BACKGROUND

33.  The allegations contained in paragraphs 1 through 29 of this Indictment are repeated and realleged as if fully set forth herein.

34.  Title 18, United States Code, Section 1960 makes it a crime to operate an unlicensed money transmitting business.  The statute was enacted in 1992 in order "to combat the growing use of money transmitting businesses to transfer large amounts of the monetary proceeds of unlawful enterprises."

35. The term "money transmitting" under Section 1960(b)(2) includes "transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier."

36. Under Title 18, United States Code Section 1960, it is a felony to conduct a "money transmitting business" if, among other things, the business is not registered as a money transmitting business with the Secretary of the Treasury as required under Title 31, United States Code, Section 5330 or regulations prescribed thereunder, or if the business otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or intended to be used to promote unlawful activity. See 31 C.F.R. §§ 1010.100(ff)(5), 1022.380(a)(2).

37. The implementing regulations for Title 31, United States Code, Section 5330 specifically apply to foreign-based money transmitting businesses doing substantial business in the United States. See 31 C.F.R. §§ 1010.100(ff)(5), 1022.380(a)(2). As noted above, LIBERTY RESERVE is estimated to have had approximately 200,000 users located in the United States, and at no time did LIBERTY RESERVE register with the United States Department of Treasury as a money transmitting business.

## STATUTORY ALLEGATIONS

38. From in or about 2006, up to and including in or about
May 2013, in the Southern District of New York and elsewhere,
LIBERTY RESERVE, ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk,"
a/k/a "Eric Paltz," VLADIMIR KATS, a/k/a "Ragnar," AHMED YASSINE
ABDELGHANI, a/k/a "Alex," ALLAN ESTEBAN HIDALGO JIMENEZ, a/k/a
"Allan Garcia," AZZEDDINE EL AMINE, MARK MARMILEV, a/k/a
"Marko," a/k/a "Mark Halls," and MAXIM CHUKHAREV, the
defendants, and others known and unknown, willfully and
knowingly did combine, conspire, confederate, and agree together
and with each other to operate an unlicensed money transmitting
business, in violation of Title 18, United States Code, Sections
1960(b)(1)(B) and 1960(b)(1)(C).

39. It was a part and an object of the conspiracy that
LIBERTY RESERVE, ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk,"
a/k/a "Eric Paltz," VLADIMIR KATS, a/k/a "Ragnar," AHMED YASSINE
ABDELGHANI, a/k/a "Alex," ALLAN ESTEBAN HIDALGO JIMENEZ, a/k/a
"Allan Garcia," AZZEDDINE EL AMINE, MARK MARMILEV, a/k/a
"Marko," a/k/a "Mark Halls," and MAXIM CHUKHAREV, the
defendants, and others known and unknown, would and did conduct,
control, manage, supervise, direct, and own all and part of a
money transmitting business affecting interstate and foreign
commerce, to wit, LIBERTY RESERVE, which (i) failed to comply
with the money transmitting business registration requirements

set forth in Title 31, United States Code, Section 5330, and the regulations prescribed thereunder, including Title 31, Code of Federal Regulations, Sections 1010.100(ff)(5) and 1022.380(a)(2); and (ii) otherwise involved the transportation and transmission of funds known to the defendants to have been derived from a criminal offense and intended to be used to promote and support unlawful activity.

OVERT ACT

40. In furtherance of said conspiracy and to effect the illegal object thereof, the following overt act, among others, was committed in the Southern District of New York and elsewhere:

a.    From on or about November 29, 2011, up to and including on or about December 6, 2011, ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk," a/k/a "Eric Paltz," the defendant, caused a series of wire transfers, totaling approximately $13.5 million, to be made from Costa Rican bank accounts held by LIBERTY RESERVE, the defendant, through a correspondent bank account in the Southern District of New York, to a shell-company bank account in Cyprus controlled by AZZEDDINE EL AMINE, the defendant.

(Title 18, United States Code, Section 371.)

**(Operation of an Unlicensed Money Transmitting Business)**

The Grand Jury further charges:

41. The allegations contained in paragraphs 1 through 29 and 34 through 37 of this Indictment are repeated and realleged as if fully set forth herein.

42. From in or about 2006, up to and including in or about May 2013, in the Southern District of New York and elsewhere, LIBERTY RESERVE, ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk," a/k/a "Eric Paltz," VLADIMIR KATS, a/k/a "Ragnar," AHMED YASSINE ABDELGHANI, a/k/a "Alex," ALLAN ESTEBAN HIDALGO JIMENEZ, a/k/a "Allan Garcia," AZZEDDINE EL AMINE, MARK MARMILEV, a/k/a "Marko," a/k/a "Mark Halls," and MAXIM CHUKHAREV, the defendants, knowingly conducted, controlled, managed, supervised, directed, and owned all and part of a money transmitting business affecting interstate and foreign commerce, to wit, LIBERTY RESERVE, which (i) failed to comply with the money transmitting business registration requirements set forth in Title 31, United States Code, Section 5330, and the regulations prescribed thereunder, including Title 31, Code of Federal Regulations, Sections 1010.100(ff)(5) and 1022.380(a)(2); and (ii) otherwise involved the transportation and transmission of funds known to the defendants to have been

derived from a criminal offense and intended to be used to promote and support unlawful activity.

(Title 18, United States Code, Sections 1960 & 2.)

## FORFEITURE ALLEGATION

43.  As a result of committing one or more of the offenses alleged in Counts One and Three of this Indictment, LIBERTY RESERVE, ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk," a/k/a "Eric Paltz," VLADIMIR KATS, a/k/a "Ragnar," AHMED YASSINE ABDELGHANI, a/k/a "Alex," ALLAN ESTEBAN HIDALGO JIMENEZ, a/k/a "Allan Garcia," AZZEDDINE EL AMINE, MARK MARMILEV, a/k/a "Marko," a/k/a "Mark Halls," and MAXIM CHUKHAREV, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), all property, real and personal, involved in the offenses and all property traceable to such property, including but not limited to:

a.  A sum of money of at least $6 billion in United States currency;

b.  All funds on deposit in the following accounts:

    i.  Banco Crédito Agrícola de Cartago (Costa Rica) Account No. 101527143, held in the name of LIBERTY RESERVE Sociedad Anonima;

    ii.  Banco Crédito Agrícola de Cartago (Costa Rica) Account No. 101527141, held in the name of LIBERTY RESERVE Sociedad Anonima;

    iii.  Banco Crédito Agrícola de Cartago (Costa Rica) Account No. 101527144, held in the name of LIBERTY RESERVE Sociedad Anonima;

iv. Banco Crédito Agrícola de Cartago (Costa Rica) Account No. 302-301-302107678, held in the name of LIBERTY RESERVE Sociedad Anonima;

v. Grupo Mutual Alajuela (Costa Rica) Account No. 140-305-803301217563, held in the name of LIBERTY RESERVE Sociedad Anonima;

vi. Grupo Mutual Alajuela (Costa Rica) Account No. 140-305-803301218849, held in the name of LIBERTY RESERVE Sociedad Anonima;

vii. Grupo Mutual Alajuela (Costa Rica) Account No. 140-305-803301218988, held in the name of LIBERTY RESERVE Sociedad Anonima;

viii. Banco Lafise (Costa Rica) Account No. 110024084, held in the name of LIBERTY RESERVE Sociedad Anonima;

ix. Banco Nacional (Costa Rica) Account No. 100021546003625, held in the name of Worldwide E-Commerce Business S.A.;

x. Banco BAC San Jose (Costa Rica) Account No. 912049962, held in the name of Grupo Lulu;

xi. Hellenic Bank (Cyprus) Account No. 240-07-576000-01, held in the name of Ediago Holding Limited;

xii. Hellenic Bank (Cyprus) Account No. 240-07-510618-01, held in the name of Serpentino LTD.;

xiii. Hellenic Bank (Cyprus) Account No. 240-01-510618-01, held in the name of Serpentino LTD.;

xiv. Hellenic Bank (Cyprus) Account No. 240-07-510619-01, held in the name of Oriata Limited;

xv. Hellenic Bank (Cyprus) Account No. 240-01-510619-01, held in the name of Oriata Limited;

xvi.   Hellenic Bank (Cyprus) Account No. 240-01-510649-01, held in the name of Arthur Budovsky;

xvii.  Hellenic Bank (Cyprus) Account No. 240-07-510649-01, held in the name of Arthur Budovsky;

xviii. Hellenic Bank (Cyprus) Account No. 240-01-521212-01, held in the name of Travertine LTD;

xix.   Hellenic Bank (Cyprus) Account No. 240-01-521214-01, held in the name of Marania Limited;

xx.    Hellenic Bank (Cyprus) Account No. 240-07-539613-01, held in the name of Makelina Limited;

xxi.   Hellenic Bank (Cyprus) Account No. 240-01-539613-01, held in the name of Makelina Limited;

xxii.  Hellenic Bank (Cyprus) Account No. 240-07-540249-01, held in the name of Allan Esteban Hidalgo Jimenez;

xxiii. Hellenic Bank (Cyprus) Account No. 240-07-568225-01, held in the name of Azzeddine El Amine;

xxiv.  Hellenic Bank (Cyprus) Account No. 240-01-568225-01, held in the name of Azzeddine El Amine;

xxv.   Hellenic Bank (Cyprus) Account No. 240-01-438977-02, held in the name of Elano Consulting Limited;

xxvi.  Hellenic Bank (Cyprus) Account No. CY09005002400002400741184302, held in the name of Phaerman Management Limited;

xxvii. Hellenic Bank (Cyprus) Account No. CY58005002400002400753771401, held in the name of Manueta Limited;

xxviii. National Bank of Greece (Cyprus) Account No. CY52006005500000005507935079, held in the name of Sandstein Limited;

xxix. National Bank of Greece (Cyprus) Account No. CY97006005500000005507935239, held in the name of Ediago Holdings Ltd.;

xxx. Cyprus Development Bank P.C. (Cyprus) Account No. CY4501400201010101005029010, held in the name of Unida Limited;

xxxi. EuroBank EFG (Cyprus) Account No. 201100040131, held in the name of Sandstein Limited;

xxxii. EuroBank EFG (Cyprus) Account No. 201100040140, held in the name of Fleureen Limited;

xxxiii. Sovetsky Bank Zao (Russia) Account No. 40702978700110001548, held in the name of Olymp-47 LLC;

xxxiv. Bank of Communications (Hong Kong) Account No. 532-9-312438-5, held in the name of Extension Asia Limited;

xxxv. Shenzhen Bank (China) Account No. 11012870675701, held in the name of Extension Asia Limited;

xxxvi. Attijariwafa Bank (Morocco) Account No. MA00781000044670004100187, held in the name of Arthur B. Belanchuk;

xxxvii. Attijariwafa Bank (Morocco) Account No. MA00781000044650004602825, held in the name of Azzeddine El Amine;

xxxviii. Banque Marocaine de Commerce Exterieur (Morocco) Account No. MA01178000048205000892589, held in the name of Ahmed Yassine;

xxxix. Banque Marocaine de Commerce Exterieur (Morocco) Account No.

MA011780000048496000892395, held in the
name of Kelsin Antonio Varela Figueroa;

xl.   Barclay's Bank (Spain) Account No.
ES5300651157130021000973, held in the name
of Arthur Budovsky;

xli.  Rietumu Bank (Latvia) Account No. LV69
RTMB 0000608806731, held in the name of
Robix Services Inc.; and

xlii. SunTrust Bank Account No. 1000049971780,
held in the name of Webdata Inc.;

c.  Up to $36,919,884 on deposit in the following

accounts:

i.    Westpac Bank (Australia) Account No.
034702289721, held in the name of
Technocash Ltd.;

ii.   Westpac Bank (Australia) Account
No.034705205706, held in the name of
Technocash Ltd.;

iii.  Westpac Bank (Australia) Account No.
034702807875, held in the name of
Technocash Ltd.; and

d.  The following domain names:

i.    LIBERTYRESERVE.COM;

ii.   EXCHANGEZONE.COM;

iii.  SWIFTEXCHANGER.COM;

iv.   MONEYCENTRALMARKET.COM;

v.    ASIANAGOLD.COM; and

vi.   EUROGOLDCASH.COM.

## SUBSTITUTE ASSET PROVISION

44.   If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(1)   cannot be located upon the exercise of due diligence;

(2)   has been transferred or sold to, or deposited with, a third person;

(3)   has been placed beyond the jurisdiction of the Court;

(4)   has been substantially diminished in value; or

(5)   has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b) and Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the above-described forfeitable property.

        (Title 18, United States Code, Section 982 and
         Title 21, United States Code, Section 853.)


_____          _____
FOREPERSON    5/20/2013          PREET BHARARA
                                 United States Attorney

                                 _____
                                 JAIKUMAR RAMASWAMY
                                 Chief, Asset Forfeiture and
                                 Money Laundering Section, Criminal
                                 Division, United States
                                 Department of Justice

Form No. USA-33s-274 (Ed. 9-25-58)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

LIBERTY RESERVE, S.A.,
ARTHUR BUDOVSKY, a/k/a "Arthur
Belanchuk," a/k/a "Eric Paltz,"
VLADIMIR KATS, a/k/a "Ragnar,"
AHMED YASSINE ABDELGHANI, a/k/a "Alex,"
ALLAN ESTEBAN HIDALGO JIMENEZ, a/k/a
"Allan Garcia,"
AZZEDDINE EL AMINE,
MARK MARMILEV, a/k/a "Marko," a/k/a
"Mark Halls," and
MAXIM CHUKHAREV

## INDICTMENT

13 Cr.

(18 U.S.C. §§ 1956, 371, 1960 & 2)

_____          PREET BHARARA
Foreperson.              United States Attorney.